No. 2--05--1260          Filed:  9-6-07

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2094 |
| GEORGE K. BAILEY, | ) ) | Honorable J. Edward Prochaska, |
| Defendant-Appellant. | ) | Judge, Presiding. |

---

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, George Bailey, appeals from his conviction of possession of a controlled substance with intent to deliver.  On appeal, defendant argues that his trial counsel was ineffective for failing to file a motion to quash his arrest and suppress evidence found pursuant to a search of the vehicle in which defendant was riding just before his arrest.  For the reasons that follow, we affirm.

Defendant was charged in connection with an incident in which police, who arrested defendant after learning during a vehicle stop that defendant had an outstanding arrest warrant, searched the car in which defendant had been riding and discovered a substance alleged to have contained cocaine.

During an October 14, 2005, pretrial conference, the following conversation took place between defense counsel, the trial court, and defendant:

"[DEFENSE COUNSEL]: *** In reviewing this case with [defendant], *** I indicated to him that I thought that a motion to suppress statements should be filed based on the evidence that was contained in the police reports. He indicated to me at that time, and again today when I talked to him about it, he wishes no motions to be filed.

* * *

THE COURT: *** [Defendant], you consulted with your attorney. You don't want any motions filed and you want to have your case set for trial, right?

THE DEFENDANT: Yes."

Before the next pretrial conference, defense counsel filed several motions in limine, including a motion to "prohibit the State from eliciting testimony from their witnesses regarding any statements made by the defendant." At the next pretrial conference, on October 24, the following conversation occurred:

"[PROSECUTOR]: I guess I have an objection to proceeding in this manner. I believe the appropriate action is for the Defense to file a Motion to Suppress Statements. In essence that's what they are doing, but they are titling it 'Motion in Limine.' If they are going to allege a Miranda violation, then it has to be filed, and there has to be a hearing on that issue, Judge. Then the Court can rule.

THE COURT: Response?

[DEFENSE COUNSEL]: The basis of a Motion in Limine is to do exactly what counsel said, deal with the evidence, to see whether it's admissible or not. ***

* * *

THE COURT: How come you didn't file a Motion to Suppress? ***

[DEFENSE COUNSEL]: The Court will recall, when we were here at the last court date, I indicated I thought there was a motion with my client, and at such time my client directed me not to do so. He did not wish to delay his 120-day speedy trial demand. I could not delay the Defendant's right to his speedy trial. I felt that there was an appropriate remedy to address the issue before trial in this manner."

The trial court ruled that defense counsel had preserved defendant's right to object during trial to the admission of the statements. (During trial, the trial court denied defendant's motion in limine.) The cause then proceeded to a trial by jury.

Because defendant's appellate arguments all center on the propriety of police conduct during his initial stop and arrest, we limit our discussion of the evidence adduced at trial to the evidence pertinent to those issues.

Officer John Parry was the first witness to testify for the State. He testified that, on July 2, 2005, at approximately 12:15 p.m., while he was on patrol, he saw a small red car whose occupants were not wearing their seat belts. He activated the lights on his patrol car and stopped the red car. As Parry was informing his radio control operator that he had stopped a car, the driver of the vehicle exited the car, and, when Parry told the driver to return to the car, the driver "for some reason[] was putting the key into the door lock." Parry identified defendant as the passenger in the car.

After checking the driver's and defendant's identification, Parry "went back to [his] squad car to listen to the license information and check for warrants," at which point he was advised that defendant had an outstanding warrant. Parry arrested defendant, and, after defendant was searched, handcuffed, and placed in a police squad car, Parry conducted a search of the passenger compartment of the vehicle. During his search, Parry found in the center console next to the passenger seat "a

plastic bag that contained smaller bags of a white course powder." The powdery substance he recovered field tested positive for the presence of cocaine. During subsequent interviews in police custody, and after more than one denial, defendant admitted that the cocaine belonged to him.

After the testimony of a crime scene technician, a forensic drug chemist, a forensic scientist specializing in latent fingerprints, and an officer from a police narcotics unit, the State rested its case, and the trial court denied defendant's motion for a directed verdict. The defense rested its case without calling any witnesses, and, after hearing closing arguments, the jury found defendant guilty of possession of a controlled substance with intent to deliver. The trial court denied defendant's motion for a new trial and sentenced him to 15 years' imprisonment. Defendant timely appeals.

Defendant's lone contention on appeal is that his conviction must be reversed because he received ineffective assistance of counsel by virtue of his attorney's failure to file a motion to quash defendant's arrest and suppress the drug evidence recovered from the car.

An accused is entitled to capable legal representation at trial. People v. Wiley, 165 Ill. 2d 259, 284 (1995). Under the two-part test articulated in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), a defendant alleging ineffective assistance of counsel will prevail only where he or she is able to show that (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. People v. Albanese, 104 Ill. 2d 504, 525 (1984), adopting Strickland, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The question of whether to file a motion to quash arrest and suppress evidence is traditionally considered a matter of trial strategy. People v. Sterling, 357 Ill. App. 3d 235, 247 (2005). A "trial counsel's strategic decisions during the course of the proceeding are generally protected by a strong

presumption that the attorney's decisions reflect sound trial strategy rather than incompetence." Wiley, 165 Ill. 2d at 289. To prevail on a claim that trial counsel was ineffective for failing to file a motion to quash and suppress, a defendant must show a reasonable probability that the motion would have been granted and the trial outcome would have been different. Sterling, 357 Ill. App. 3d at 247. Defendant's appeal rises and falls, then, with the merit of the motion to quash and suppress that he proposes counsel should have presented.

The question of whether defense counsel provided ineffective assistance requires a bifurcated standard of review, wherein a reviewing court must defer to the trial court's findings of fact unless they are against the manifest weight of the evidence but must make a de novo assessment of the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim. People v. Davis, 353 Ill. App. 3d 790, 794 (2004). Here, the facts surrounding the ineffective assistance claim are undisputed, and the dispositive question is whether, based on the facts as presented, a motion to quash and suppress probably would have been granted. This question, too, receives de novo review. People v. Sorenson, 196 Ill. 2d 425, 431 (2001). We therefore review defendant's arguments de novo.

Before we reach the merits of a motion to quash and suppress, we must discuss a threshold issue presented by the State. The State argues that defendant understood that a pretrial motion to suppress could have been filed on his behalf, yet he knowingly waived such arguments when he told his counsel that he did not want any motions filed for fear of delaying his trial. The State directs us to People v. Whalen, 158 Ill. 2d 415 (1994), as support for this argument. In Whalen, the trial court barred the defense from presenting expert testimony, because the defense "had been dilatory in disclosing the expert's identity." Whalen, 158 Ill. 2d at 424. The trial judge suggested, however, that

it could grant a continuance so that the defense could present the witness after the State had time to prepare. Whalen, 158 Ill. 2d at 425. After learning that such a continuance would delay his trial, the defendant himself indicated that he did not want a continuance. Whalen, 158 Ill. 2d at 425. The supreme court held that the defendant had waived objection to the trial court's decision to bar the testimony. Whalen, 158 Ill. 2d at 426-28.

The State observes that defendant here stated in open court that he wished to forgo a motion to suppress and he wished to begin his trial, and it argues by analogy to Whalen that defendant's statement constituted a waiver of any challenge to counsel's failure to file a pretrial motion to suppress. We disagree. As defendant notes, the above excerpts make clear that the only motion to suppress that trial counsel contemplated was a motion to suppress statements to police, not a motion to quash defendant's arrest and suppress the subsequently found physical evidence. Therefore, there is nothing in the record to indicate that defendant was made aware of the grounds to quash and suppress now argued. Accordingly, unlike the defendant in Whalen, defendant here did not specifically waive the particular arguments raised on appeal. Though defendant did indicate that he did not want counsel to file any pretrial motions, we cannot assume he would have reached the same decision if the arguments he makes now on appeal had been presented to him. We therefore consider defendant's arguments on their merits. Defendant offers four separate grounds on which he argues that a motion to quash and suppress would have succeeded, and we consider each in turn.

First, defendant argues that his arrest should have been quashed (and any evidence uncovered as a result suppressed) because Parry's warrant check, which led to defendant's arrest, violated defendant's statutory protections under Illinois law. On this point, defendant directs us to subsection

12--603.1(f) of the Illinois Vehicle Code (625 ILCS 5/12--603.1(f) (West 2004)), which provides as follows, in pertinent part:

"A law enforcement officer may not search or inspect a motor vehicle, its contents, the driver, or a passenger solely because of a [seat belt violation]." 625 ILCS 5/12--603.1(f) (West 2004).

Subsection 108--1(3) of the Code of Criminal Procedure of 1963 (725 ILCS 5/108--1(3) (West 2004)) contains the same provision:

"A law enforcement officer may not search or inspect a motor vehicle, its contents, the driver, or a passenger solely because of a violation of Section 12--603.1 of the Illinois Vehicle Code." 725 ILCS 5/108--1(3) (West 2004).

Officer Parry did not develop probable cause to arrest defendant until he conducted a check for outstanding warrants, and, according to defendant, that check constituted a search or inspection based solely on a seat belt violation, as prohibited by the above statutory provisions. The question presented to us, then, is whether a warrant check during a traffic stop constitutes a "search" or "inspect[ion]" of a passenger under the above statutes, so that such a check is not justified by a stop for a seat belt violation.

"The primary goal of statutory interpretation is to ascertain and give effect to the intent of the legislature." In re Detention of Powell, 217 Ill. 2d 123, 135 (2005). "The most reliable indicator of legislative intent is the language of the statute, which is to be given its plain, ordinary and popularly understood meaning." Powell, 217 Ill. 2d at 135.

We have little difficulty determining that the word "search" as used in the statutes does not apply here. "Where statutes are enacted after judicial opinions are published, it must be presumed

that the legislature acted with knowledge of the prevailing case law." People v. Hickman, 163 Ill. 2d 250, 262 (1994). In interpreting a statute, courts will presume that the legislature knew of prior interpretations placed on particular language by judicial decision. Carver v. Bond/Fayette/Effingham Regional Board of School Trustees, 146 Ill. 2d 347, 353 (1992). Further, "words and phrases having well-defined meanings in the common law are interpreted to have the same meanings when used in statutes dealing with the same or similar subject matter as that with which they were associated at common law." Scott v. Dreis & Krump Manufacturing Co., 26 Ill. App. 3d 971, 983 (1975).

The statutory subsections at issue here were added to both of the above statutes via Public Act 85--291 (Pub. Act 85--291, eff. January 1, 1988). At that time, the above statutes provided that motor vehicles, drivers, or passengers could not be "stopped or searched" solely on the basis of a seat belt violation. 625 ILCS 5/12--603.1(e) (West 2002); 725 ILCS 5/108--1(d)(2) (West 2002). With Public Act 93--99 (Pub. Act 93--99, eff. July 3, 2003), the legislature adopted the "search and inspect" language quoted above. At both times, case law examined the reasonableness of a warrant check during a traffic stop in terms of whether it unjustifiably extended a defendant's detention, not in terms of whether the facts justified an additional search after the traffic stop. See People v. Easley, 288 Ill. App. 3d 487, 491-92 (1997) (warrant check extends detention occasioned by traffic stop); People v. Clodfelder, 172 Ill. App. 3d 1030, 1035 (1988) ("where *** a valid Terry stop has been made, retention by the officer of the person stopped long enough to make a warrant check has usually been permissible"); People v. Ellis, 113 Ill. App. 3d 314, 320 (1983) ("a warrant check pursuant to a Terry stop does not convert a stop into a full-fledged arrest"). Those cases, then, treated a warrant check not as a search, which occurs when a reasonable expectation of privacy is infringed (People v. Mannozzi, 260 Ill. App. 3d 199, 203 (1994), citing United States v. Jacobsen,

466 U.S. 109, 113, 80 L. Ed. 2d 85, 94, 104 S. Ct. 1652, 1656 (1984)), but rather as a seizure, which occurs when a person's " 'freedom of movement is restrained' " (People v. Brownlee, 186 Ill. 2d 501, 517 (1999), quoting United States v. Mendenhall, 446 U.S. 544, 553, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980)).  Thus, at the time the above statutes were enacted, a warrant check during a traffic stop was viewed not as a search but rather as an extension of a seizure.  Accord People v. Roberson, 367 Ill. App. 3d 193, 201 (2006) (a defendant's privacy interests are not offended by a warrant check, because the existence of an arrest warrant is a matter of public record).  Because we must presume that the legislature intended to use the term "search" as it was defined in this context at the time it enacted the above statutes, we conclude that it did not intend to bar police from conducting a warrant check under these circumstances when it barred them from conducting a "search" based solely on a seat belt violation.

Though the meaning of the word "search" in the statutes has a clear meaning that does not apply here, the word "inspect," as used in the above statutes, is not so clear.  Defendant and the State offer competing definitions of the term.  Defendant avers in his brief that the word "inspect" means " 'to examine, scrutinize, investigate, look into or check over.' "  Black's Law Dictionary 716 (5th ed. 1979).  Under defendant's view, a warrant check constitutes an officer's investigating or checking over a passenger.  The State contends that we should take the word "inspect" to be synonymous with the word "search" and thus interpret it to mean "to look into or examine persons, places, or things."  Under the State's view, because a warrant check is not a search, and because a warrant check entails a review of a suspect's record instead of "a motor vehicle, its contents, the driver, or a passenger," the statutes should not apply.

Both views are feasible, and additional sources support both approaches. For example, in support of the State's view, Webster's Third New International Dictionary carries three definitions of the term "inspect." First, it defines the word as meaning "to view closely and critically *** [or] examine with care," and it lists the word "scrutinize" as a synonym. Webster's Third New International Dictionary 1170 (1986). Second, it defines the word as meaning "to view and examine officially *** [or] to look carefully." Webster's Third New International Dictionary 1170 (1986). Third, it lists an archaic meaning of the word as "to look carefully [or] make an examination," and this meaning is synonymous with the word "search." Webster's Third New International Dictionary 1170 (1986). Likewise, the term "inspection," as defined in Black's Law Dictionary, means "[a] careful examination of something, such as goods *** or items produced in response to a discovery request." Black's Law Dictionary 799 (7th ed. 1999). Ballentine's Law Dictionary likewise defines "inspect" as meaning "[t]o look upon; to examine for the purpose of determining quality, detecting what is wrong, and the like; to view narrowly and critically; as to inspect conduct." Ballentine's Law Dictionary 638 (3rd ed. 1969).

On the other hand, in support of defendant's interpretation, Webster's Collegiate Thesaurus lists the following synonyms for the word "inspect": scrutinize, canvass, check over, check up, con, examine, study, survey, vet, view. Webster's Collegiate Thesaurus 414 (1988).

Other intrinsic aids to construction only add to the ambiguity from the above conflicting definitions. At least two such intrinsic aids support defendant's view. First, "[a] court should construe a statute, if possible, so that no term is rendered superfluous or meaningless." People v. Maggette, 195 Ill. 2d 336, 350 (2001). If we were to adopt the State's interpretation of "inspect" as

being synonymous with "search," then the legislature's inclusion of the word "inspect" in the above statutes would become superfluous.

Second, "[a]s used in its ordinary sense, the word 'or' marks an alternative indicating the various members of the sentence which it connects are to be taken separately." People v. Frieberg, 147 Ill. 2d 326, 349 (1992). The fact that in both statutes the legislature referred to "search or inspect" (emphasis added), then, indicates that the terms are to be considered separately.

A third intrinsic presumption supports the State's view. In construing a statute, we "must assume that the legislature did not intend an absurd or unjust result." People v. Pullen, 192 Ill. 2d 36, 42 (2000). If we were to follow defendant's argument and conclude that the word "inspect" encompasses something different from the word "search" in the above statutes, we would be confronted with the question of what police conduct, precisely, the legislature meant to bar when it proscribed inspections based solely on a seat belt stop. If the word were to be interpreted to refer to any police review, evaluation, or vetting of a passenger, it might forestall not only the type of warrant check at issue here but also other minimally intrusive and likely common police practices, such as evaluating demeanor or scanning for dangerous objects in plain view inside a stopped vehicle. We must presume that the legislature did not intend such absurd results.

Based on both the above definitions and other intrinsic aids to construction, we conclude that the word "inspect" is ambiguous as used in the above-quoted statutes. "Where a statute is unclear, a court may consider legislative history in order to establish legislative intent." People v. Lowe, 153 Ill. 2d 195, 203 (1992). As noted, at one point the statutes in question referred to searches and seizures when they stated that passengers could not be "stopped or searched" solely for seat belt violations, but the statutes were later amended to remove the reference to a "stop" and to insert the

-11-

word "inspect." "The presumption is that, when a legislature amends an act by deleting certain language therefrom, it intended to change the law in that respect." People v. Youngbey, 82 Ill. 2d 556, 563 (1980). We must therefore presume that the legislature meant to remove seizures from the auspices of the above statutes when it amended them. The legislative history, then, indicates that the legislature did not intend a warrant check, which as noted above does not constitute a search but rather an extension of a seizure to the extent the suspect must wait while police perform the check, to be covered by the postamendment versions of the statutes.

In interpreting an ambiguous statute, courts may also resort to extrinsic sources such as legislative debate to determine legislative intent. Lowe, 153 Ill. 2d at 203. The legislative debate, including the comments of Senator Cullerton, the sponsor of Public Act 93--99, supports our conclusion that the legislature did not intend the above statutes to bar expeditious warrant checks during a seat belt stop:

"What this bill says is that like every other law, like littering--if you're driving down the street and throw a piece of paper out the window, the police officer can stop you and charge you with littering--this would--this bill would say that if you weren't wearing your seat belt, they could stop you and give you *** a ticket." 93d Ill. Gen. Assem., Senate Proceedings, April 3, 2003, at 25 (statements of Senator Cullerton).

Thus, Senator Cullerton viewed the purpose of the bill as removing the restriction that police could not stop a car solely for a seat belt violation. Further legislative debate on the amendment indicates that the legislature did not intend the above statutes to confer any additional protection beyond that provided by the fourth amendment. First, an exchange between Senators Righter and Cullerton:

"SENATOR RIGHTER:

*** The amendment that you added to the bill prohibits searches and seizures of vehicles if someone is pulled over for a violation of the--the seat belt law that--that you're proposing. How does that differ from someone who's pulled over for speeding or for a taillight out? I mean, does this add a special prohibition on law enforcement that otherwise they don't already have?

***

SENATOR CULLERTON:

That amendment was based on a--a Maryland law and it's just to reassure people that this is not an excuse to stop the--stop the people and go into their *** cars. The same law applies *** whatever the probable cause is that allows a police officer to go into a trunk *** still applies here. But this particular law does not allow them--just want to reassure people, just by stopping somebody just for this citation, it doesn't give 'em any extra right to go in and search someone's car.

***

SENATOR RIGHTER:

*** I'm concerned about the police officer out there on the street who's trying to figure out what rule he or she has to go by in order to lawfully search *** a vehicle.

***

SENATOR CULLERTON:

Well, *** I'm glad you asked the question *** for the purposes of legislative intent, to make it clear. Whatever the current practice is, whatever the current law is, as set by case

law or by *** statute, as to allowing police officers to search vehicles, that's not changed by *** this bill." 93d Ill. Gen. Assem., Senate Proceedings, April 3, 2003, at 27-28 (statements of Senators Righter and Cullerton).

A later exchange between Senators Obama and Cullerton further underscores the point that the above statutes were not meant to alter the standard, fourth amendment approach to vehicle stops:

"SENATOR OBAMA:

A second question, because I've heard a couple of concerns. I just want to make sure. With respect to search and seizure rules and regulations, I want to *** clarify this. Under current law, if you are pulled over for a taillight being out *** what are the rules currently governing whether a search can take place, based on an ordinary traffic stop?

***

SENATOR CULLERTON:

Well, *** I assume it's probably more case law than statute, but *** the Supreme Court has kind of set out through their decisions situations where police officers have the right to go in and search in someone's car, in the trunk or whatever. That *** remains the same. Whatever those laws are, whatever that case law is, that remains the same with this bill. We only wanted to make sure people knew that this particular bill doesn't give one any extra right to go into a search where they otherwise could not." 93d Ill. Gen. Assem., Senate Proceedings, April 3, 2003, at 30-31 (statements of Senators Obama and Cullerton).

A discussion between Representatives Franks and Beaubien in the Illinois House mirrors the above discussions:

"Franks: Okay. I'm not sure I understand... I guess my analysis here says that this would say that they can... that a police officer may not search or inspect a motor vehicle that was stopped solely because of a seatbelt violation.

Beaubien: That's correct, that's part of the law... part of the Act, yes.

* * *

Franks: But isn't the law right now that you can't search a vehicle unless there's probable cause?

Beaubien: I believe that's correct, but there seemed to be some need to put this in the Bill so it was very specific to all parties involved this would not be used for a method of stopping cars and searching vehicles with the normal exceptions for open view and so forth.

* * *

Franks: Okay. 'Cause I'm just trying to figure out what we're *** doing here and I'm not trying... no offense, I'm just not sure I understand this. Because right now, I know the law has probable cause and I'm not sure what this Bill does any differently than maybe just codifying case law?

Beaubien: Representative Franks, *** this is not an area that I am familiar with. I put the language in there because I believe it sets forth what's already in the law." 93d Ill. Gen. Assem., House Proceedings, May 20, 2003, at 26-27 (statements of Representatives Franks and Beaubien).

The legislative history and debate, then, demonstrate that the legislature did not intend the above statutes to confer any additional protection, beyond that afforded by the fourth amendment,

to a suspect during a traffic stop; rather, the legislature included the language at issue only to assuage any fears that the statute would curtail motorists' fourth amendment rights.

Given this legislative history and debate, we conclude that the legislature's statement that police cannot "inspect" a passenger solely for a seat belt violation was not meant to encompass an expeditious warrant check during a seat belt traffic stop where such a warrant check is otherwise acceptable under the fourth amendment. The question becomes, then, whether expeditious warrant checks during traffic stops are generally acceptable under the fourth amendment.[1]

This question was addressed directly by the Fourth District in Roberson, and we agree with the analysis in that case, which we briefly reiterate. See Roberson, 367 Ill. App. 3d at 196-202. In People v. Harris, 207 Ill. 2d 515 (2003), our supreme court held that a warrant check during a traffic stop " 'was impermissible because it changed the fundamental nature of the traffic stop' " by converting the stop " 'from a routine traffic stop into an investigation of past wrongdoing.' " Roberson, 367 Ill. App. 3d at 198, quoting Harris, 207 Ill. 2d at 528. However, the United States Supreme Court later vacated our supreme court's decision in Harris (see Illinois v. Harris, 543 U.S. 1135, 161 L. Ed. 2d 94, 125 S. Ct. 1292 (2005) (mem. op.)) and remanded the cause for further consideration in light of the Supreme Court's decision in Illinois v. Caballes, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005). Roberson, 367 Ill. App. 3d at 198. (Our supreme court has not yet issued a new opinion in Harris.) In Caballes, the Supreme Court held that the manner of

---

[1]There is no allegation that the warrant check here extended the duration of the stop, nor is there factual support in the record for such an allegation. Therefore, we consider only whether a warrant check under these circumstances, and under no further extenuating circumstances, passes fourth amendment muster.

executing a traffic stop, lawful in its inception, would violate the fourth amendment only if the police officer did something that, "in itself, 'unreasonably infringe[d] interests protected by the Constitution.' " Roberson, 367 Ill. App. 3d at 200, quoting Caballes, 543 U.S. at 407, 160 L. Ed. 2d at 846, 125 S. Ct. at 837. The Roberson court concluded as follows:

"By the logic of Caballes, checking for warrants on a passenger changes the fundamental nature of the traffic stop only if (1) it causes the seizure to last longer than the time reasonably required for such a traffic stop or (2) it infringes upon the passenger's legitimate interest in privacy. The record contains no evidence that checking for warrants on the passenger *** caused the traffic stop to be unreasonably long. As for [the passenger's] privacy interests, '[t]he existence of an arrest warrant is a matter of public record.' " Roberson, 367 Ill. App. 3d at 201, quoting Gist v. Macon County Sheriff's Department, 284 Ill. App. 3d 367, 377 (1996).

We conclude likewise here, and we therefore hold that the fourth amendment generally allows expeditious warrant checks during traffic stops. Because we conclude that the legislature did not intend to expand upon fourth amendment protections when it enacted the above statutes, we hold that the above statutes were not intended to bar police from conducting such checks.

Based on our interpretation of the words "search" and "inspect" in the above statutes, we conclude that police are not barred by those statutes from conducting expeditious warrant checks during stops justified solely by seat belt violations. Since we hold that police are not so barred, we reject defendant's argument that the police in this case violated his statutory rights by conducting a warrant check.

Defendant second argues that the police search of his car was barred by subsection 108--1(1) of the Code of Criminal Procedure (725 ILCS 5/108--1(1) (West 2004)), which provides as follows:

"Search without warrant. (1) When a lawful arrest is effected a peace officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of:

(a) Protecting the officer from attack; or

(b) Preventing the person from escaping; or

(c) Discovering the fruits of the crime; or

(d) Discovering any instruments, articles, or things which may have been used in the commission of, or which may constitute evidence of, an offense." 725 ILCS 5/108--1(1) (West 2004).

Defendant argues that this section provides protection against searches and seizures beyond that provided by the United States and Illinois constitutions, by limiting warrantless searches incident to arrest to the "immediate area" surrounding an arrestee and only under the circumstances specifically described in the statute. The State does not respond to this argument in any way in its response brief to this court. "When an appellee does not address arguments in [its] brief, [its] position should be equivalent to that as if [it] had not filed a brief at all." Plooy v. Paryani, 275 Ill. App. 3d 1074, 1088 (1995). "When the record is simple, and the claimed errors are such that this court can easily decide them on the merits without the aid of an appellee's brief, this court should decide the appeal on its merits." Plooy, 275 Ill. App. 3d at 1088, citing First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 133 (1976). "Otherwise, if the appellant's brief demonstrates prima facie reversible error and the contentions of the brief find support in the record,

the judgment of the trial court may be reversed." Plooy, 275 Ill. App. 3d at 1088, citing Talandis, 63 Ill. 2d at 133.[2] We would normally treat the State's silence as acquiescence to defendant's argument, but, here, our independent review convinces us that we must reject defendant's argument.

At oral argument, defendant emphasized that the Illinois legislature may create a statutory right that is broader than a simultaneously applicable constitutional right. See People v. Campbell, 224 Ill. 2d 80, 85 (2006). We agree with this principle. The question presented here is whether Illinois intended to expand upon constitutional protection when it enacted subsection 108--1(1) of the Code of Criminal Procedure. Defendant's precise argument, that the above statute provides protection in addition to any constitutional protection, was rejected in People v. Hering, 27 Ill. App. 3d 936, 941 (1975):

> "The defendant contends that since the officer testified that he had not arrested the defendant at the time of the search, *** the search was invalid because section 108--1 of the

---

[2]It has been noted that the rule from Talandis may not apply with equal force to a criminal appeal, because "[t]he consequences of counsel's negligence in a criminal appeal are much harsher; while a negligent attorney in a civil case is liable for damages, 'no attorney can restore his client's lost liberty.'" People v. White, 117 Ill. 2d 194, 229 (1987) (Simon, J., concurring), quoting People v. Brown, 39 Ill. 2d 307, 311 (1968). "A reviewing court that decides an important question *** without briefing or argument for the defendant ignores [the axiomatic imperative to 'hear the other side']." White, 117 Ill. 2d at 229 (Simon, J., concurring). However, these concerns for a defendant's liberty do not apply here, because it is the State, and not defense counsel, that failed to brief an issue. In any event, because we decide this issue on its merits, the question of the applicability of the Talandis rule becomes moot.

Code of Criminal Procedure [citation] provides that a search may only be made pursuant to a warrant or a valid arrest. The defendant recognizes [that the search was valid under normal fourth amendment analysis], but rather cites People v. Collins, 49 Ill. 2d 179 ***, holding that States may give more protection than the Federal constitution or the United States Supreme Court minimum protections, and that the Illinois legislature has done so in the area of search and seizure by the above provision in section 108--1 of the [Code of Criminal Procedure]. However, nothing in the statute or the Comments thereto suggests that it is to be exclusive. Rather, it authorizes searches incident to arrest within prescribed bounds as to area and purpose." Hering, 27 Ill. App. 3d at 941.

Though we acknowledge that this reading renders subsection 108--1(1) superfluous (because a statute can "allow" police to do only what the fourth amendment does not prohibit police from doing), we agree with the court in Hering that the language of the statute compels the conclusion that it was not intended to add to fourth amendment restrictions on police conduct. First, as the Hering court noted, the relevant language is permissive, not restrictive. The statute states when police "may" conduct warrantless searches, and it offers no indication, such as the use of the word "only," that the instances it describes are meant to be exclusive. Further, subsection 108--1(3), which we quote above in our discussion of defendant's first appellate argument, provides that police "may not search or inspect" solely for a seat belt violation. 725 ILCS 5/108--1(3) (West 2004). This subsection tells us two things. First, if the legislature had intended to limit police searches to those described in subsection 108--1(1), then it would be redundant to exclude seat belt searches specifically. Second, the fact that the legislature used limiting language--"may not"--in subsection 108--1(3) indicates that,

by using dissimilar language--"may"--in subsection 108--1(1), the legislature intended a different meaning.

Our reading of subsection 108--1(1) is consistent with the apparent purpose of the subsection. Though we are not aware of any court's explicitly declaring that subsection 108--1(1) was enacted as a way to codify constitutional decisions concerning the search-incident-to-arrest exception to the fourth amendment's requirement of warrants for all searches, the committee comments to section 108--1 generally so indicate. The comments refer liberally to fourth amendment case law on the issue and, indeed, seem to rely on that case law. See 725 ILCS Ann. 5/108--1, Committee Comments--1970, at 7 (Smith Hurd 2006) ("The extent of the permissible area of search incidental to an arrest is not entirely clear from the Illinois and federal decisions, but they seem to boil down to the person and 'immediate presence' of the person arrested" (emphasis in original)).[3] Further, several courts have explicitly stated that subsection 108--1.1 (725 ILCS 5/108--1.1 (West 2004)), which immediately follows the subsection at issue here, was enacted to codify the United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1, 20 L. Ed 2d 889, 88 S. Ct. 1868 (1968). E.g., People v. Flowers, 179 Ill. 2d 257, 262-63 (1997).

The section 108--1 committee comments also refer to the police "right to search." 725 ILCS Ann. 5/108--1, Committee Comments--1970, at 6 (Smith Hurd 2006). Though reference to a police "right to search" is an unusual formulation of an exception to the fourth amendment's protection against unreasonable searches and seizures (which provides rights to individuals, not the police), its

---

[3]At oral argument, defendant asserted that the comments to this section indicate that it was meant to expand on federal and state constitutional decisions. On the contrary, we interpret the committee comments as relying on those decisions.

use in the committee comments bolsters the conclusion that the legislature's creation of subsection 108--1(1) was an attempt, however ineffectual, to ensure the power of police to search incident to arrest.[4]  Accordingly, cases applying subsection 108--1(1) do so under the assumption that it acts to enable police and not to add to any prohibitions on their conduct.  See People v. Seymour, 84 Ill. 2d 24, 33 (1981) ("The right to search a person incident to a lawful arrest *** does not *** depend solely upon the provisions of our statute"); People v. Pickett, 39 Ill. 2d 88, 96 (1968) ("we do not believe the search was unreasonable and conclude that the trial court did not interpret section 108--1(d) as permitting an unreasonable search"); People v. McKinney, 274 Ill. App. 3d 880, 889 (1995) (declaring, just after quoting section 108--1, that "[p]olice officers have broad statutory authority to conduct a search once they have effected a lawful arrest"); People v. Zeller, 51 Ill. App. 3d 935, 939 (1977) ("Section 108--1 *** authorizes the search of an arrestee for a variety of reasons, including to protect the officer from attack").

Our reading of subsection 108--1(1) is also consistent with supreme court precedent.  The argument defendant advances here, that subsection 108--1(1) provides protection supplemental to the fourth amendment, was the precise argument raised by the dissent in People v. Hoskins, 101 Ill. 2d 209 (1984).  In Hoskins, a defendant challenged a search of her discarded purse incident to her

---

[4]We say that the legislature's attempt to codify the search-incident-to-arrest exception to the warrant requirement is ineffectual because it purports to grant power to police, yet any power such a statute may grant police must yield to constitutional protection afforded against it.  If the fourth amendment were to be interpreted not to allow searches incident to arrest, a statute purporting to allow the searches would become meaningless.  Statutes are relevant in this situation only where they grant extra protection to individuals, not where they purport to take constitutional protection away.

arrest. The majority cited subsection 108--1(1) (then Ill. Rev. Stat. 1981, ch. 38, par. 108--1) as stating "the circumstances under which a search incident to a lawful arrest may be conducted." Hoskins, 101 Ill. 2d at 213. It then evaluated the propriety of the search in light of fourth amendment jurisprudence, and it held that the search was appropriate in light of, inter alia, the United States Supreme Court's decisions in United States v. Robinson, 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973), and New York v. Belton, 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981). See Hoskins, 101 Ill. 2d at 214-18. It thus implicitly rejected the position of the dissent that "[t]he Illinois legislature has enacted a statute on the subject of a search incident to arrest," and "[e]ven if the State's interpretation of Belton was correct, established Illinois law cannot be broadened in the scope of a search incident to an arrest by the Supreme Court's decision in that case." Hoskins, 101 Ill. 2d at 227 (Clark, J., dissenting). The dissent urged, just as defendant here urges, that "[i]t is perfectly proper for Illinois to grant more protection to its citizens from unwarranted intrusions into their private belongings than the minimum Federal requirements under the fourth amendment to the Federal constitution." Hoskins, 101 Ill. 2d at 228 (Clark, J., dissenting). Because the Hoskins majority did not adopt the dissent's position, and because the majority relied on fourth amendment jurisprudence in determining whether the search at issue was proper under subsection 108--1(1), we infer that the majority opinion in Hoskins supports our conclusion that subsection 108--1(1) is to be read as coextensive with, and not separate from, the fourth amendment. See also People v. Dillon, 102 Ill. 2d 522, 525 (1984) ("When that statute is considered in light of [two United States Supreme Court cases as well as Hoskins], it may well be that the seizure *** could be sustained as a search incidental to [the] defendant's arrest"); People v. Tisler, 103 Ill. 2d 226, 258 (1984) (Clark, J.,

dissenting) (noting that Hoskins involved an interplay among the federal and state constitutions and also subsection 108--1(1) and that the Hoskins majority found Belton to be controlling).

Accordingly, based on both the supreme court's guidance on this issue and our own interpretation, we conclude that subsection 108--1(1) was enacted in an attempt to codify case law establishing an exception to the fourth amendment's warrant requirement, for searches incident to arrest. We therefore reject defendant's argument that subsection 108--1(1) confers additional protection beyond that contained in the United States and Illinois constitutions.

Defendant's third appellate argument is that, notwithstanding any protection given him under Illinois statutes, Officer Parry's search incident to defendant's arrest violated his protection under the fourth amendment to the United States Constitution (U.S. Const., amend. IV). "The fourth amendment to the United States Constitution guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " Sorenson, 196 Ill. 2d at 432, quoting U.S. Const., amend. IV. "Although the fourth amendment generally requires a warrant supported by probable cause [citation], there are 'a few specifically established and well-delineated exceptions' to the warrant requirement." People v. Moss, 217 Ill. 2d 511, 518 (2005), citing Flowers, 179 Ill. 2d at 262, and quoting Katz v. United States, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967).

One such exception to the warrant requirement allows police to conduct a warrantless search incident to arrest under certain circumstances. In Belton,"[i]n order to establish [a] workable rule" for automobile searches incident to arrest, the Supreme Court established a bright-line rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."

Belton, 453 U.S. at 460, 69 L. Ed. 2d at 775, 101 S. Ct. at 2864. Defendant concedes that, under

Belton, he "cannot complain that the search of the automobile *** was constitutionally invalid."

Defendant argues, however, that we need not follow the bright-line rule from Belton in light of the

Supreme Court's later decision in Thornton v. United States, 541 U.S. 615, 158 L. Ed. 2d 905, 124

S. Ct. 2127 (2004).

In Thornton, the Supreme Court held that "Belton governs even when an officer does not

make contact until the person arrested has left the vehicle." Thornton, 541 U.S. at 617, 158 L. Ed.

2d at 911, 124 S. Ct. at 2129. Justice Scalia concurred separately and argued that Belton should be

limited "to cases where it is reasonable to believe evidence relevant to the crime of arrest might be

found in the vehicle." Thornton, 541 U.S. at 632, 158 L. Ed. 2d at 920, 124 S. Ct. at 2137 (Scalia,

J., concurring). Justice Scalia summarized his position at the outset of his concurrence:

"When [the defendant's] car was searched in this case, he was neither in, nor

anywhere near, the passenger compartment of his vehicle. Rather, he was handcuffed and

secured in the back of the officer's squad car. The risk that he would nevertheless 'grab a

weapon or evidentiary item' from his car was remote in the extreme. The Court's effort to

apply our current doctrine to this search stretches it beyond its breaking point." Thornton,

541 U.S. at 625, 158 L. Ed. 2d at 916, 124 S. Ct. at 2133 (Scalia, J., concurring).

Defendant seizes on Justice Scalia's opinion and argues that "[i]t would strain credulity to

argue that Officer Parry had any reasonable belief that there was any evidence in the car associated

with the prior arrest warrant for domestic violence." Defendant further argues that there is no

explanation for "how searching the car would have the slightest effect on officer safety or the

preservation of evidence." Even casting aside the point that there was a second occupant in the car

in this case (and thus perhaps a stronger threat to officer safety than in <u>Thornton</u>, in which the arrested defendant had been the car's only occupant), we cannot accept defendant's invitation to follow the reasoning in Justice Scalia's opinion in <u>Thornton</u>.

It is axiomatic that only the Supreme Court, and not any lower court, may overrule Supreme Court precedent, even if that precedent rests on reasons rejected in another line of decisions. <u>E.g.</u>, <u>Agostini v. Felton</u>, 521 U.S. 203, 238, 138 L. Ed. 2d 391, 423, 117 S. Ct. 1997, 2017 (1997). Though Justice Scalia criticized <u>Belton</u>, his opinion was not part of the <u>Thornton</u> plurality. In response to Justice Scalia's concurrence, the plurality opinion stated as follows:

"Whatever the merits of [Justice Scalia's] opinion concurring in the judgment, this is the wrong case in which to address them. Petitioner has never argued that <u>Belton</u> should be limited 'to cases where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle,' [citation], nor did any court below consider [Justice Scalia's] reasoning. See <u>Pennsylvania Dept. of Corrections v. Yeskey</u>, 524 U.S. 206, 212-13, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) (' "Where issues are neither raised before nor considered by the Court of Appeals, this Court will not ordinarily consider them" ' [citation]). The question presented *** [in the petition for <u>certiori</u>] does not fairly encompass [Justice Scalia's] analysis. See [the Supreme Court's] Rule 14.1(a) ('Only the questions set out in the petition, or fairly included therein, will be considered by the Court'). And the United States has never had an opportunity to respond to such an approach. [Citation.] Under these circumstances, it would be imprudent to overrule *** our established constitutional precedent, *** and we decline to do so at this time." <u>Thornton</u>, 541 U.S. at 624-25 n.4, 158 L. Ed. 2d at 915 n.4, 124 S. Ct. at 2132-33 n.4.

No. 2--05--1260

Four justices concurred in the plurality opinion, and a fifth justice, Justice O'Connor, joined in all but the above-quoted footnote. Justice O'Connor wrote separately to "express [her] dissatisfaction with the state of the law in this area." Thornton, 541 U.S. at 624, 158 L. Ed. 2d at 915, 124 S. Ct. at 2133 (O'Connor, J., concurring in part). She concluded that, "[w]hile the approach [Justice Scalia] proposes appears to be built on firmer ground, [she was] reluctant to adopt it in the context of a case in which neither the Government nor the petitioner has had a chance to speak for its merit." Thornton, 541 U.S. at 624-25, 158 L. Ed. 2d at 915, 124 S. Ct. at 2133 (O'Connor, J., concurring in part). Thus, including Justice O'Connor, a five-justice majority of the Supreme Court expressly declined to overrule Belton.

Defendant urges that "[a] closer look at footnote 4 reveals *** that the Thornton plurality was not rejecting Justice Scalia's interpretation of Belton" but rather "suspending judgment until another day after the lower courts had an opportunity to weigh in on the validity of Justice Scalia's analysis." Defendant argues, then, that since the majority in Thornton did not disagree with Justice Scalia's analysis, a lower court's applying Justice Scalia's approach would not violate Supreme Court precedent. We disagree. Thornton expressly refused to overrule Belton. Thus, Belton remains the law, and, if we were to depart from Belton, we would violate Supreme Court precedent in Belton, even if such a departure could be considered to be consistent with the reasoning in Thornton. The language upon which defendant relies from the above footnote does not constitute an invitation to lower courts to consider Belton anew; rather, it constitutes the Supreme Court's holding that it would not address the issue because the issue had not been properly presented to the Court. Defendant's proposition that the Supreme Court suspended its judgment on the issue in order to allow lower

-27-

courts to weigh in is directly at odds with the notion that only the Supreme Court, and not any lower court, may overrule Supreme Court precedent.

Defendant's final appellate argument is that, even if we are bound by Belton to hold that the search here did not violate the fourth amendment, we should hold that the search violated additional protection provided by the search and seizure provision of our state constitution. Ill. Const. 1970, art. I, §6. The search and seizure provision of the Illinois Constitution is interpreted in "limited lockstep" with the fourth amendment to the United States Constitution. Caballes, 221 Ill. 2d at 288-317 (reaffirming "limited lockstep" doctrine). "Under this approach, [Illinois courts] will 'look first to the federal constitution, and only if federal law provides no relief turn to the state constitution to determine whether a specific criterion--for example, unique state history or state experience--justifies departure from federal precedent.' " Caballes, 221 Ill. 2d at 309, quoting L. Friedman, The Constitutional Value of Dialogue and the New Judicial Federalism, 28 Hastings Const. L.Q. 93, 104 (2000). In Caballes, after declaring its adherence to the limited lockstep approach, the supreme court declared that it would "not depart from the intent of the framers of the Illinois Constitution of 1970 or the understanding of the voters who adopted it *** to tip the balance in favor of expanding the scope of the right to be free from unreasonable searches and seizures that is already guaranteed by the fourth amendment." Caballes, 221 Ill. 2d at 316.

Defendant argues that the limited lockstep doctrine does not dictate that we follow Belton, because the "framers of the Illinois Constitution could not have intended to endorse the bright-line Belton rule since Belton was decided *** 11 years after the adoption of the Illinois Constitution of 1970." We disagree with defendant's approach. The supreme court in Caballes did not hold that Illinois courts should construe the search and seizure clause of the Illinois Constitution in lockstep

with the United States Constitution because the Illinois framers intended to codify then-existing federal case law. Rather, the supreme court's approach was "based on the premise that the drafters of the 1970 constitution and the delegates to the constitutional convention intended the phrase 'search and seizure' in the state document to mean, in general, what the same phrase means in the federal constitution." Caballes, 221 Ill. 2d at 314. Caballes holds that the framers intended the search and seizure clause of the Illinois Constitution to remain cognate with the fourth amendment. Accordingly, if the meaning of the fourth amendment were to change as interpreted by case law, then the meaning of the Illinois search and seizure clause must change with it. Defendant's approach, which would have us ignore any fourth amendment precedent that postdates the adoption of the Illinois Constitution, would eviscerate the very principle of limited lockstep interpretation declared in Caballes.

Defendant also urges that we should depart from lockstep here in deference to "the unique, historical Illinois policy of prohibiting warrantless vehicular searches unsupported by reasonable or probable cause that Belton has inadvertently spawned." In support of this proposition, defendant cites Illinois precedent that predates the Illinois Constitution of 1970 and that seems to favor Justice Scalia's approach in Thornton. See People v. Lewis, 34 Ill. 2d 211 (1966) (search of defendant's vehicle's trunk incident to his arrest was unreasonable under the fourth amendment). First, we note that Lewis was decided on fourth amendment grounds, and, therefore, Belton would control it even if the limited lockstep doctrine did not so dictate. Second, again because Lewis was decided on fourth amendment grounds (and with reference to several Supreme Court cases), we disagree with defendant that it evinces a "unique" policy in Illinois against the type of search at issue here such that we should depart from the limited lockstep doctrine.

Further, as the State points out in its brief, our supreme court has adopted the Belton rule. In People v. Stehman, 203 Ill. 2d 26 (2002), the issue presented was "whether Belton's bright-line rule extends to a situation where the first contact the defendant has with the officer occurs after [the defendant has exited] the vehicle." Stehman, 203 Ill. 2d at 36. (Stehman predated the United States Supreme Court's decision in Thornton, which held that Belton did extend to such circumstances.) In conducting its analysis of whether a search was permissible under the fourth amendment and the Illinois Constitution (see Stehman, 203 Ill. 2d at 33-34 (citing both constitutions)), our supreme court presumed that, to the extent Belton allowed the search, Belton was controlling (see Stehman, 203 Ill. 2d at 36-42 (determining the scope of the Belton rule)). See also People v. Dieppa, 357 Ill. App. 3d 847, 851 (2005) (we "are compelled to reject" defendant's invitation to depart from Belton and hold a search unconstitutional on state law grounds. "The Illinois Supreme Court has adopted the Belton rule").

Because we reject all four grounds that defendant argues justified a motion to quash arrest and suppress evidence, we conclude that such a motion would not have succeeded even if defense counsel had raised it. Therefore, we reject defendant's contention that counsel was ineffective for failing to bring such a motion.

Affirmed.

BYRNE and CALLUM, JJ., concur.