NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170854-U

NO. 4-17-0854

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 22, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL BREWSTER, Defendant-Appellant. | ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Livingston County No. 15CF297 Honorable Jennifer Hartmann Bauknecht, Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) Omitting to file a motion for the suppression of evidence fell within the wide range of reasonable professional assistance.

(2) The alleged sentencing error of double enhancement is forfeited, and because this alleged error is less than clear or obvious, the doctrine of plain error does not avert the forfeiture.

¶ 2    After being convicted and sentenced for sexual offenses, defendant, Michael Brewster, appeals. He makes two arguments. First, he argues that defense counsel rendered ineffective assistance by failing to move for the suppression of defendant's statement to the police. We hold that the omission of such a motion fell within the wide range of reasonable professional assistance. Second, defendant argues that the circuit court erred in the sentencing hearing by considering, as an aggravating factor, psychological harm that already was inherent in the offenses. We hold that defendant has procedurally forfeited this argument and that, absent a clear and

obvious error, the doctrine of plain error does not avert the forfeiture. Therefore, we affirm the judgment.

¶ 3                                I. BACKGROUND

¶ 4          Defendant's 16-year-old stepdaughter, R.M., alleged that defendant had touched her sexually and that, at his insistence, she had performed fellatio on him. In response to those allegations, a police officer, Keith Semmerling, went to defendant's mother's house and requested defendant to come to the police station in Fairbury, Illinois, for an interview. Defendant did so.

¶ 5          In the police station, Semmerling told defendant that the interview would be video- and audio-recorded and that he, Semmerling, just wanted to clear defendant's name. Semmerling then picked up a sheet of paper and remarked, "I've got to read this to everyone who comes in as well." He read to defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), namely, that defendant, had the right to remain silent; that anything he said could be used against him in a court of law; that he had the right to talk to a lawyer and have the lawyer present while he was being questioned; that if he could not afford a lawyer, one would be appointed to represent him before any questioning, if he wished; and that he could decide at any time to exercise these rights and not to answer any questions or make any statements. The reading of these rights took about 20 seconds, after which Semmerling asked defendant if he understood. Defendant, who had an eighth-grade education, answered, "Yeah." At Semmerling's request, defendant then signed the *Miranda* paper.

¶ 6          In the ensuing interview, defendant stated that after drinking a lot, he tended to black out and that, consequently, he could not say whether R.M.'s allegations against him were untrue. He thought that her allegations were untrue, but he could not say for sure, because he had no memory of what happened during blackouts.

¶ 7          After making that statement, defendant asked if he needed a lawyer. Another police officer, named Travis, replied that defendant did not need a lawyer and that he was not under arrest. Again defendant stated that, frequently, he drank to the point of blacking out, leaving gaps in his memory, and thus he could not confidently deny R.M.'s allegations but that it was his belief that her allegations were false.

¶ 8          In a bench trial, after R.M. and Semmerling testified and defendant's video- and audio-recorded statement was played, the circuit court found defendant guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)). In its decision, the court wrote: "[Defendant] drinks a lot and blacks out from alcohol. Although he said he did not recall this ever happening, he also conceded that it could have happened."

¶ 9          In the subsequent sentencing hearing, the circuit court received a written statement from R.M., in which she described how she had been suffering emotionally from defendant's sexual offenses against her. One of the factors in aggravation, the State argued, was that defendant's conduct threatened serious harm: "the victim in this case," the State asserted, "suffered irrevocable psychological damage, harm on her; and that's borne out in the victim impact statement that was admitted prior to the sentencing hearing today." The court agreed, saying, "[T]here's certainly emotional harm based upon not only the statement from the victim but also the victim's demeanor while testifying, and I think I commented on that in the order. So[,] your conduct certainly threatened harm and at least emotionally and developmentally for this young girl." The court sentenced defendant to 10 years' imprisonment for criminal sexual assault and a consecutive term of 5 years' imprisonment for aggravated criminal sexual abuse, with mandatory supervised release ranging from 3 years to life.

¶ 10    Defendant moved for a reduction of the sentence. The circuit court denied the motion.

¶ 11    This appeal followed.

¶ 12                    II. ANALYSIS

¶ 13    A. The Claim That Defense Counsel Rendered Ineffective Assistance
by Omitting a Motion to Suppress Defendant's Statement to the Police

¶ 14            1. *The Strong Presumption Against That Claim,
Requiring a Strong Rebuttal From Defendant*

¶ 15    Defendant claims that by omitting to move for the suppression of his statement to the police, defense counsel rendered ineffective assistance.

¶ 16    Whether to move for the suppression of evidence is a matter of trial strategy. *People v. Brannon*, 2013 IL App (2d) 111084, ¶ 35. Even the best criminal defense attorneys, in defending a particular client, would not necessarily choose the same strategy. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To give defense attorneys ample space to exercise their own professional judgment, without the distorting incentives of judicial second-guessing (*id.* at 690), case law raises "a strong presumption" (*Brannon*, 2013 IL App (2d) 111084, ¶ 35) that strategic decisions by defense attorneys are within "the wide range of reasonable professional assistance" (*Strickland*, 466 U.S. at 689).

¶ 17    That does not mean that strategic decisions by defense counsel are exempt from scrutiny. Presumptions can be rebutted. But a strong presumption requires a strong rebuttal. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 463 (1983). "If a strong presumption arises, the weight of the evidence brought in to rebut it must be great." *Id.* There is "a strong presumption" that defense counsel's decision to forego a motion for suppression is a "sound trial strategy." *Brannon*, 2013 IL App (2d) 111084, ¶ 35; *People v. Bailey*, 375 Ill. App. 3d 1055, 1059

- 4 -

(2007); see *People v. Wiley*, 165 Ill. 2d 259, 289 (1995). To rebut that strong presumption, a defendant would have to make not merely an arguable case, but a strong case, that the evidence in question was suppressible. See *Franciscan*, 95 Ill. 2d at 463. The case for suppression would have to be strong enough—the prospect for success would have had to seem rosy enough—that every reasonable defense counsel would have felt professionally obligated to file a motion for suppression. See *Strickland*, 466 U.S. at 689 (remarking that "[t]here are countless ways to provide effective assistance in any given case").

¶ 18                              2. *Defendant's Arguments for Suppression*

¶ 19                         a. An Interviewer's Misrepresentation of His Motive

¶ 20         Defendant complains that, at the beginning of the interview, Semmerling professed a desire to clear defendant's name. Let us assume, for the sake of argument, that this representation by Semmerling was false and that Semmerling had precisely the opposite desire—that is, he wanted to incriminate defendant. Even so, a case cited by defendant says: "[M]isrepresentations [of fact] are not enough to render a suspect's ensuing confession involuntary, nor [do such misrepresentations] undermine the waiver of the defendant's *Miranda* rights." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). If Semmerling misrepresented his motive, it was a misrepresentation of fact—which, under *Lall*, did not render defendant's statement to the police involuntary or vitiate the *Miranda* warning. See *id.*

¶ 21                         b. Telling Defendant He Did Not Need an Attorney

¶ 22         Defendant has a stronger argument grounded on Travis's assurance to him that he did not need an attorney. Arguably, that assurance had more of a tendency to dilute one of the *Miranda* warnings: that anything defendant said could be used against him in a court of law. The trouble with this argument, though, is that before Travis told defendant he did not need an attorney,

defendant already made the statement on which the circuit court relied in finding him guilty: that alcoholic blackouts made him unable to definitively deny the truth of R.M.'s allegations. Defendant made that statement before and after Travis's assurance to him. Thus, there was no prejudice.

¶ 23　　　　　　　　　c. Characterizing the *Miranda* Warnings as a Procedure

¶ 24　　　　Before reading the *Miranda* warnings to defendant, Semmerling remarked: "I've got to read this to everyone who comes in as well." Defendant complains that, by this remark, Semmerling lessened the impact and gravity of the *Miranda* warnings. According to defendant, Semmerling is comparable to the detective in *People v. Alfaro*, 386 Ill. App. 3d 271, 305 (2008), who, to quote the Second District, "minimized the impact of the [*Miranda*] warnings by stating that he was administering them 'just for formality.' " Defendant also compares Semmerling to the detective in *Ross v. State*, 45 So. 3d 403, 429 (Fla. 2010), who, according to the Supreme Court of Florida, "de-emphasized the significance of the *Miranda* warnings" by calling them "just a matter of procedure," thereby "convey[ing] the clear impression that the warnings were merely a bureaucratic formality." But Semmerling never called the *Miranda* warnings a "formality" or "just" anything. Instead, he told defendant he had to read them to everyone who came in—which might well have been true if, by "everyone," Semmerling meant suspects who came in to be interviewed.

¶ 25　　　　The reading of the *Miranda* warnings was a mandatory procedure in the Fairbury Police Station. This did not diminish their gravity or significance. Procedures can be important. The Supreme Court itself calls the *Miranda* warnings a "procedure" (*Miranda*, 384 U.S. at 483-84)—because that is, after all, what they are: "an established or official way of doing something" (New Oxford American Dictionary 1358 (2001)).

¶ 26          d. The Lack of an Admonitory Preface to the *Miranda* Warnings

¶ 27          Defendant complains that before reading him the *Miranda* warnings, Semmerling failed to (1) "identify[ ] what he was about to read" and (2) "inform [defendant] of the importance of *** what he was about to read."

¶ 28          We are unaware of any case holding that the *Miranda* warnings require such an admonitory preface. Rather, the Supreme Court prescribed the following "procedural safeguards": "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. We see no mention of "These are your constitutional rights, and they are important."

¶ 29          e. Semmerling's Hurried Reading of the *Miranda* Warnings

¶ 30          Defendant criticizes Semmerling's hurried, monotone reading of the *Miranda* warnings to defendant. But defendant answered, "Yeah," when Semmerling asked him if he understood, and defendant signed the *Miranda* paper. It may be that if a suspect is intellectually impaired, such an affirmative answer and signature would be insufficient to prove that the waiver was knowingly and understandingly made. See *In re S.W.N.*, 2016 IL App (3d) 160080, ¶¶ 83, 86. We see no evidence, however, that defendant is intellectually impaired. Just because he dropped out of school after eighth grade, it does not follow that he is a person of "low intelligence." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). A reasonable defense counsel could have concluded that, by all appearances, defendant had the capacity to understand plain English and, therefore, his affirmative answer to Semmerling should be taken as true: he understood the *Miranda* warnings.

¶ 31          B. The Claim That, in the Sentencing Hearing, the Circuit Court Considered as an Aggravating Factor a Harm That Already Was Inherent in the Offense

¶ 32     Defendant argues that "[b]ecause psychological harm is implicit in all sexual assaults involving children, the trial court improperly considered this factor when sentencing [him]." Although defendant never raised this issue in his postsentencing motion, he seeks to avert the resulting forfeiture by invoking the rule of plain error. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 33     "To obtain relief under this rule, a defendant must first show that a clear or obvious error occurred." *Id.* For the following reasons, we are unconvinced that the alleged sentencing error is clear or obvious.

¶ 34     The error that defendant alleges is called "a double enhancement." "A double enhancement occurs when either (1) a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed, or (2) the same factor is used twice to elevate the severity of the offense itself." *People v. Guevara*, 216 Ill. 2d 533, 545 (2005).

¶ 35     An example of a double enhancement in the first sense is using the death of the victim as an aggravating factor in a sentence for voluntary manslaughter. See *People v. Saldivar*, 113 Ill. 2d 256, 271 (1986). By contrast, the degree of damage the defendant inflicted on the victim's body can be an aggravating factor because "the force employed and the physical manner in which the victim's death was brought about" differ from one voluntary manslaughter to another. *Id.* at 271-72. Because some mortal wounds can be more gruesome than others, this is a variable that may serve as an aggravating factor. See *id.* But the end result of death does not differ from one voluntary manslaughter to another; there are no degrees of death. The death of the victim is an invariable element of the offense and, hence, cannot *aggravate* the offense or make it worse. *Id.* at 272.

¶ 36        Common sense would suggest that psychological harm to the victim almost always results from criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2014)) or aggravated criminal sexual abuse (*id.* § 11-1.60(b)). And yet, psychological harm is an element of neither offense. Rather, psychological harm is a variable, like the gruesomeness of mortal wounds in a voluntary manslaughter. Some victims of sexual offenses suffer more psychological harm than others. Thus, psychological harm to the victim is a legitimate aggravating factor in sentences for criminal sexual assault and aggravated criminal sexual abuse. See 730 ILCS 5/5-5-3.2(a)(1) (West 2014) (providing that it is a factor in aggravation that "the defendant's conduct caused or threatened serious harm").

¶ 37        Psychological harm was not "used both as an *element* of an offense and as a basis for imposing a harsher sentence than might otherwise have been imposed." (Emphasis added and internal quotation marks omitted.) *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). Nor do we see any indication that the circuit court used psychological harm twice to elevate the severity of either offense. See *id.* Because the alleged sentencing error, therefore, is unclear, we hold defendant to his procedural forfeiture of this sentencing issue. See *Hillier*, 237 Ill. 2d at 545.

¶ 38                                III. CONCLUSION

¶ 39        In sum, omitting to file a motion for suppression was not ineffective assistance, and the alleged sentencing error is procedurally forfeited. Thus, we affirm the circuit court's judgment.

¶ 40        Affirmed.